In the Interest of A.B.B., a Child.

No. 07–89–0134–CV.

Court of Appeals of Texas, Amarillo.

Jan. 4, 1990.

Jim Mattox, Atty. Gen., Sue Berkel, Austin, for appellant.

Dunn & Walker, Jonette M. Walker, Lubbock, for appellee.

Before REYNOLDS, C.J., and DODSON and BOYD, JJ.

REYNOLDS, Chief Justice.

The Texas Department of Human Services (TDHS) has appealed from a judgment, rendered after a placement hearing required by Chapter 18 of the Texas Family Code, ordering that the child be returned to his mother. The appeal necessitates our initial determination whether the appeal is maintainable; and, if so, then our determinations whether TDHS is liable for the attorney ad litem fee awarded and assessed as costs, and whether the evidence is legally and factually sufficient to support the court's order for return of the child to his mother. Concluding that we have jurisdiction over the appeal, that TDHS is not liable for the attorney ad litem fee, and that the judgment is not otherwise vulnera-

ble to TDHS's attacks, we will reform the judgment and affirm.

TDHS instituted a suit affecting the parent-child relationship to secure, and was granted, temporary managing conservatorship of A.B.B., a five-month-old boy, after his second hospitalization for treatment of injuries sustained in his home. Then, TDHS placed the child with his maternal grandparents for foster care.

Approximately five months later, the maternal grandparents intervened, seeking to be appointed sole managing conservators of the child. The next day, TDHS petitioned for a hearing, required by Chapter 18 of the Texas Family Code Annotated (Vernon 1986; Vernon Supp.1989),[1] to review its conservatorship appointment and placement of the child. In so petitioning, TDHS requested that it be dismissed as temporary managing conservator and that the court order placement of the child with his maternal grandparents, but the petition did not contain an alternative request that TDHS be retained as temporary managing conservator if the child was not placed with his maternal grandparents.

Following a hearing, the court ordered the conservatorship of TDHS terminated and the child returned to his mother, assessing all costs of the proceeding against TDHS. By a separate instrument, the court approved a fee of $600 for the appointed attorney ad litem. The approval does not indicate whether the fee was assessed as costs, but the $600 was included in the clerk's bill of costs.

After TDHS perfected its appeal, the child's mother moved for a dismissal of the appeal for want of jurisdiction. The premise for the want of jurisdiction is that an appeal from a chapter 18 judgment is not authorized by section 11.19. In this connection, the mother notes that section 11.19(b), which provides that "an appeal may be taken" by a party to a suit affecting the parent-child relationship from an

---

1. Unless indicated otherwise, any subsequent cite of a chapter or section is a reference to that chapter or section of the Texas Family Code Annotated (Vernon 1986; Vernon Supp.1989).

order, decree, or judgment entered under chapters 13 through 16, does not authorize an appeal from a final judgment under chapter 18. The motion is not well-premised.

The preceding section 11.19(a) provides that "[a]ppeals from orders, decrees, or judgments entered in suits affecting the parent-child relationship, when allowed under this section or under other provisions of law, shall be as in civil cases generally." One of the "other provisions of law" is that:

> In a civil case in which the judgment or amount in controversy exceeds $100, exclusive of interest and costs, a person may take an appeal or writ of error to the court of appeals from a final judgment of the district or county court.

Tex.Civ.Prac. & Rem.Code Ann. § 51.012 (Vernon 1986).[2] It is beyond dispute that the judgment appealed from, and the amount in controversy, exceeds $100, exclusive of interest and costs. Thus, this court has jurisdiction of the appeal. Tex. Gov't Code Ann. § 22.220(a) (Vernon 1988).

■ Moreover, "Court[s] of Appeals shall have appellate jurisdiction co-extensive with the limits of their respective districts, which shall extend to all cases of which the District Courts or County Courts have original or appellate jurisdiction, under such restrictions and regulations as may be prescribed by law." Tex. Const. art. V, § 6. The final judgment here was rendered in a cause over which the district court had original jurisdiction. The language quoted by the mother from section 11.19(b) is permissive, not restrictive, and, therefore, it does not apply restrictively to prohibit an appeal from a chapter 18 final judgment. *See Harbison v. McMurray,* 138 Tex. 192, 158 S.W.2d 284, 287 (1942).

Consequently, the mother's motion for dismissal of the appeal for want of jurisdiction is overruled.

As earlier noted, the court approved an attorney ad litem fee of $600, but did not indicate whether the fee was assessed as costs. However, the clerk of ·the court included the fee in the certified bill of costs, and the parties have accepted that the court assessed the fee against TDHS. Assuming, *arguendo,* that is the effect of the court's approval and judgment, we agree with TDHS's second of four contentions why it is not liable for the court-approved attorney ad litem fee.

■ In this cause, TDHS initiated the suit to be named temporary managing conservator of the child. Section 11.10(d) provides, in part, that:

> In any suit brought by a governmental entity seeking ... to be named conservator of a child, the court shall appoint an attorney ad litem to represent the interests of the child as soon as practicable to insure adequate representation of the child's interest.

The court did appoint an attorney ad litem, whose fee is, in these circumstances, controlled by the first sentence of section 11.10(e), which specifies, as material here, that:

> An attorney appointed to represent a child ... as authorized by this section is entitled to a reasonable fee in the amount set by the court which is to be paid by the parents of the child unless the parents are indigent.

The court did not find that the child's parents are indigent and, therefore, there is no discretionary power to hold TDHS liable for the attorney ad litem fee.[3] *Klement v. Munder,* 619 S.W.2d 31, 32 (Tex.Civ.App.—

**2.** This section emerged as the 1985 recodification, intended to be "without substantive change," of Article 2249, Revised Civil Statutes of Texas, which provided, in part, that, without a limitation of a dollar amount, "[a]n appeal or Writ of Error may be taken to the Court of Appeals from every final judgment of the district court in civil cases, ..." Act of June 8,

1981, ch. 291, § 55, 1981 Tex.Gen.Laws 761, 785, *repealed by* Act of June 16, 1985, ch. 959, § 9, 1985 Tex.Gen.Laws 3242, 3322.

**3.** Concededly, section 11.10(e) does not specify who is to pay the attorney ad litem fee set by the court in a suit brought by a governmental entity seeking only to be named conservator of

El Paso 1981, no writ). *See also Cochrane v. Homes of St. Mark,* 687 S.W.2d 394, 396 (Tex.App.—Houston [14th Dist.] 1985, no writ).

Consequently, we sustain TDHS's second point of error by which it contends it has no liability for the attorney ad litem fee that, by operation of section 11.10(e) on the facts, is imposed on the parents; and, conformably, we will render the judgment the trial court should have rendered. Tex.R. App.P. 81(c). On this issue, then, it becomes unnecessary to discuss TDHS's first-, third-, and fourth-point contentions why it otherwise is not liable for the attorney ad litem fee. Tex.R.App.P. 90(a).

As previously noticed, the court ordered the child be returned to his mother, section 18.06(2), and with its remaining points of error five through eight, TDHS attacks that determination. TDHS contends that the evidence is legally and factually insufficient to support the court's determination that it was in the best interest of the child to return him, respectively, to his parents and to his father.

■ In so contending, TDHS recognizes that the court only ordered the child to be returned to his mother, but argues that the effect of the court's order is to restore the parental rights of the father, who because of his shortcomings, including his thirty-five year incarceration for the offense of burglary, should not have the child returned to him. However, the controlling effect of the court's judgment is the one expressed on the face of the judgment— *i.e.,* the termination of TDHS's temporary managing conservatorship and the return of the child to his mother—and not an effect that may be deduced from the evidence before the court. *Harrison v. Manvel Oil Co.,* 142 Tex. 669, 180 S.W.2d 909, 915 (1944). Thus, TDHS's seventh- and eighth-point contentions that the evidence is legally and factually insufficient to support the return of the child to his father

must be, and they are, overruled for the reason that they are immaterial to the controlling issues adjudicated. *Reed v. Buck,* 370 S.W.2d 867, 874 (Tex.1963).

It is to be recalled that when TDHS petitioned for the placement hearing, it requested the termination of its temporary managing conservatorship of the child and the placement of the child with his maternal grandparents. TDHS secured the termination of its conservatorship; but, in the judgment of the trial court, TDHS, facing the presumption that the best interest of the child is served by placing him with his mother, did not discharge its burden to prove that the best interest of the child would be served by placing him with his maternal grandparents. *See Herrera v. Herrera,* 409 S.W.2d 395, 396 (Tex.1966).

■ Hence, TDHS's fifth point that the evidence is legally insufficient to support the court's placement of the child with his parents, *i.e.,* his mother, coupled with its prayer for rendition of judgment in its favor, must be considered as a contention that TDHS established as a matter of law that the best interest of the child would be served by placing him with his maternal grandparents. *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983). The contention requires that we first examine the record for evidence that supports the court's determination while ignoring all evidence to the contrary. If there is an absence of supporting evidence, then we must examine the entire record to see whether it establishes as a matter of law that the best interest of the child would be served by placing him with his maternal grandparents. *Holley v. Watts,* 629 S.W.2d 694, 696 (Tex.1982). In examining the evidence bearing on the best interest of the child, we will give consideration to the pertinent factors noticed in *Holley v. Adams,* 544 S.W.2d 367, 372 (Tex.1976).

■ Within the evidential record, which later will be considered in depth in the

---

a child whose parents are indigent. That issue is not before us and we express no

opinion on it.

address to TDHS's sixth point, there is evidence of the physical and emotional needs of the child, as well as evidence on behalf of both the mother and the maternal grandparents of their love for and ability to nurture the child, and their plans and ability to provide for the child, financially and physically. Supportive of the court's determination is evidence that the child's injury in the home and delayed medical treatment, which triggered TDHS's suit, was the result of an accident, not abusive treatment, and that the evinced delay in obtaining medical treatment stemmed from the mother's ignorance of medical facts, not from her intentional disregard of the child's needs. Further, there is evidence of instability of the maternal grandparents' home environment, and that they themselves were the subject of a previous TDHS referral concerning another child.

Thus, there is some evidence of probative force that supports the court's placement of the child with his mother. As a result, TDHS's fifth point of error must fail, and it is overruled, without our consideration of the contrary evidence. *Holley v. Watts,* 629 S.W.2d at 697.

■ Nevertheless, we must consider all of the evidence to resolve TDHS's sixth point that the evidence is factually insufficient to support the court's determination. The point will be sustained if the court's determination is so contrary to the overwhelming weight of the evidence as to be manifestly wrong and unjust, *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); otherwise, it cannot be said that the court abused its discretion in determining the best interest of the child. *Gillespie v. Gillespie,* 644 S.W.2d 449, 451 (Tex.1982).

■ Weighing only six pounds and five ounces at birth, the child, A.B.B., was and, as he grew, remained in the 25th percentile of newborns judged according to weight. When he was three and one-half months old, he was hospitalized because of intermittent vomiting over a two-day period. He was observed to be lethargic, having poor head control, and mildly dehydrated, with a loss of weight ranking him in the 5th percentile. His illness was first diagnosed as viral meningitis or a possible "gastric flap." He was administered i.v. antibiotics, a reasonable treatment, but not one that is a response to viral meningitis. Approximately ten days later, he was released.

A few days afterwards, the child was rehospitalized after he again began vomiting. His weight had dropped below the 5th percentile, producing a diagnosis of "failure to thrive." Of significance to the doctor was the increase of the child's head circumference from the 25th percentile to the 90th percentile. To the doctor, this indicated a fluid collection on the brain with resulting pressure on brain tissue, which can cause brain atrophy or mental retardation. Although the child has some possibility of a mild development delay, he definitely has made developmental strides and seems to be relatively well.

During the child's second hospitalization, TDHS was telephoned by a party identifying herself by name, who reported a pattern of abusive treatment toward the child by his parents. Subsequently, however, there was evidence that the call was not made by the person named, but was made by the mother's cousin, who made a false report.

The abusive treatment reported was slapping, pinching, and thumping, which produced bruises, blood blisters, burns, and fingernail marks. The report, though at variance with the undisputed evidence that the child was not outwardly bruised, was somewhat consistent with the child's hospitalized condition, which indicated a traumatic injury resulting from intentional shaking or severe accident, neither of which had been mentioned by the mother.

Upon investigation, TDHS interviewed two witnesses, one of whom was the mother's cousin, who reported observing injuries identical to those described by the telephone complainant. The investigation was not advanced by the uncooperativeness of

the child's parents, his paternal grandparents, and his great grandparents. On the strength of its information, TDHS brought the suit underlying this appeal.

Adduced was evidence of a favorable home study of the maternal grandparents, albeit its objectivity was questioned, and evidence that their financial position was superior to the mother's. The pediatrician attending the child testified that the child seems to be doing fairly well under the foster care of his maternal grandparents, and that they seemed to have given the child adequate care.

The mother answered the allegations that she, or possibly the child's father, had injured the child by intentionally shaking him, and that she failed to seek prompt medical attention for his injury. Her testimony was that while carrying the child, she tripped over a saddle on the floor in hurrying to answer the telephone. She was not sure whether the child hit a tile floor, a linoleum floor, a carpeted floor, the sofa leg, the side of a pool table, or the wall. Given this account of the accident, medical witnesses testified that it was statistically "unlikely, but possible" that the accident could have caused the injuries sustained by the child.

After the fall, the child, in the mother's words, "acted a little funny," but later he appeared to be normal for two days. Then, he began vomiting, but the mother did not connect it to the fall. Admitting that she did not call the doctor or tell many people about the accident for fear of the conclusions they might draw or intervention by Children's Protective Services, the mother maintained that she principally based her decision on the child's appearance of normalcy. She attributed the child's "failure to thrive" diagnosis to his three weeks of vomiting and "poor feeding" following his injury.

Witnesses, including the one whose name was used as the telephone complainant, gave favorable accounts of the mother's parenting skills, her relationship with the child, and the general home environment.

Evidence of the mother's financial sources sufficient to care for the child was introduced.

The evidence is conflicting as to which placement would best serve the interest of the child. In this situation of conflicting considerations, the trial court must be accorded a large measure of discretion in determining the proper placement. That court, not this one, had the opportunity to observe and evaluate the demeanor of the witnesses, to judge their credibility and assign weight to their testimony, and to assess the needs of the child and arrive at the placement that best serves those needs.

Upon consideration of the whole record, we cannot say that the court abused its discretion in accepting as the most believable the evidence showing that the best interest of the child would be served by placing him with his mother. It follows that the court's determination is not so against the overwhelming weight of the evidence as to be manifestly wrong and unjust. TDHS's sixth point of error is overruled.

Accordingly, the judgment is reformed to order that the attorney ad litem fee is to be paid by the child's parents, M.B. and B.B., and, as reformed, is affirmed. Costs occasioned by this appeal are taxed 80% to the Texas Department of Human Services and 20% to the mother, B.B. Tex.R.App.P. 89.